# IN THE SUPREME COURT OF IOWA

No. 15–0871

Filed June 9, 2017

Amended August 9, 2017

**STATE OF IOWA,**

Appellee,

vs.

**JOHN DAVID GREEN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Sac County, Gary L. McMinimee, Judge.

John David Green seeks further review of a court of appeals decision affirming his conviction of murder in the second degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, Joseph A. Fraioli (until withdrawal) and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers and Douglas D. Hammerand, Assistant Attorneys General, for appellee.

**CADY, Chief Justice.**

In this case, we consider the right to counsel under article I, section 10 of the Iowa Constitution. We also consider the court's use of a malice-inference jury instruction. The district court held John David Green did not have a right to counsel under the Iowa Constitution when he voluntarily participated in a noncustodial police interview under the supervision of an Iowa county attorney, even though the State's homicide investigation had by then focused on Green as the primary suspect. The district court also instructed the jury that it could infer Green acted with malice aforethought from his use of a baseball bat, despite Green's objection that he did not bring the bat to the fatal encounter. The court of appeals affirmed the district court on both the claimed errors, finding article I, section 10 could not apply to the preaccusation stage of a criminal investigation, and the jury could infer malice aforethought from the intentional use of a deadly weapon. We conclude the level of prosecutorial involvement at the time of the interview did not create a prosecution or case that would trigger the right to counsel under article I, section 10. We further conclude the jury could properly infer malice aforethought from Green's use of a deadly weapon. Therefore, we affirm the decision of the court of appeals.

## I. Factual Background and Proceedings.

Mark Koster lived in a one-bedroom house in Sac City. In 2009, he seemingly disappeared from the area without notice. Police were alerted after mail began to accumulate in the mailbox at his house and he stopped paying his utility bills. Police found a handwritten note attached to the back door of Koster's house. The note indicated he had gone to Florida for the winter and would return in the spring. A phone number on the note was the number of a Florida resort, but the resort had no

record of Koster. As a result, police entered and searched the home. Nothing looked suspicious, except Koster's clothes and personal belongings had not been removed from the home.

After Koster failed to return to his house in the spring, police continued to investigate his disappearance. They learned from neighbors and others that a man had been staying with Koster. The man was described as tall. The investigation, however, led no further. Two years passed with no answers or information. Koster was subsequently presumed dead, and his house was sold.

The new owner of the home discovered a decomposed body buried under a pile of debris in the basement. The state medical examiner identified the body as Koster. A renewed law enforcement investigation eventually located the man who had stayed with Koster prior to his disappearance. His name was John David Green, and police located him in a camper near Jacksonville, Florida.

The Sac County attorney, two police officers, and an agent from the Iowa Department of Criminal Investigation traveled to Florida. They approached Green at his camper. Green agreed to accompany them to a nearby police station for an interview. Green was told he was not under arrest and was free to leave. He was not informed of his *Miranda* rights prior to or at any time during the interview or told of a right to counsel.

The interview was conducted in an unlocked room of the police station. Green sat on a couch, and law enforcement officers sat on chairs. The county attorney was not in the interview room, but watched from another room in the station. Multiple times throughout the interview, one of the officers would leave the interview room to consult with the county attorney. During these consultations, the county

attorney would direct the officers to ask specific questions. The interview was recorded.

Green eventually confessed to killing Koster after the two men had an altercation in Koster's Sac City home one evening in 2009. Green said Koster became upset with him and started a fight by striking him with a baseball bat. During the fight, the two fell onto a table and then the ground, struggling over the bat. Green, much larger in size than Koster, gained control and pressed the bat against Koster's throat until he could no longer breathe. Green held it there until Koster died.

Green then wrapped Koster's body in blankets and placed it in the basement of the home. He covered the body with cat litter and piled a variety of items over it, including an old, heavy water heater. He propped up the broken table next to the pile of debris. Green then cleaned the house, attached the note to the back door, and left town.

Law enforcement officers initially returned Green to his camper after this confession, but arrested him after the county attorney obtained an arrest warrant. He was returned to Iowa and charged with first-degree murder. *See* Iowa Code §§ 707.1, .2 (2009).

Prior to trial, Green moved to suppress the interview with police in Florida. Pertinent to this appeal, he claimed the State obtained his confession in violation of his right to counsel. Green asserted that his right to counsel had attached at the time of the interview because the case had effectively transformed from an investigation into a prosecution based on the active role of the county attorney during the interview. The district court overruled the motion.

At trial, the State introduced the entire interview as evidence. The State also used portions of the interview during cross-examination of Green and in closing arguments.

The medical examiner testified that an autopsy of Koster's body showed the cause of death was consistent with Green's version of the events. The medical examiner also testified it would have taken approximately two minutes to asphyxiate a person by applying pressure to the neck with a straight object. Green testified he acted in self-defense.

The district court instructed the jury, over Green's objection, that if a person had an opportunity to deliberate and used a dangerous weapon against another resulting in death, the jury may infer "the weapon was used with malice, malice aforethought, premeditation, and specific intent to kill." The district court also instructed the jury that a dangerous weapon was an instrument actually used in a way to indicate "the user intended to inflict death or serious injury, and when so used is capable of inflicting death."

The jury found Green guilty of murder in the second degree. In doing so, the jury found Green suffocated Koster without justification and with malice aforethought. The district court sentenced Green to an indeterminate sentence of fifty years with a mandatory minimum term of incarceration of thirty-five years.

Green appealed and raised two claims of error. First, he claimed his confession was obtained in violation of his right to counsel under the Iowa Constitution. Second, he claimed that the jury instruction on the inference of malice and the definition of a dangerous weapon were improper since there was no evidence introduced at trial that Green initiated the physical altercation or that Green took the bat to the altercation.

We transferred the case to the court of appeals. The court of appeals affirmed the judgment and sentence. We granted further review.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017). We look to the entire record and "make 'an independent evaluation of the totality of the circumstances.' " *Id.* (quoting *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015)). On factual matters, we give deference to the trial court, but we are not bound by its findings. *Id.*

Similarly, when a jury instruction implicates a constitutional right, our review is de novo. *See State v. Becker*, 818 N.W.2d 135, 140–41 (Iowa 2012), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). If the instruction does not implicate a constitutional right, we review the challenge for correction of errors at law. *See Alcala*, 880 N.W.2d at 707–08. On review for correction of errors at law, we are to "determine whether the challenged instruction accurately states the law and is supported by substantial evidence." *State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010).

## III. Error Preservation.

Green preserved error on his article I, section 10 challenge by citing the provision in his motion to suppress, arguing its independent interpretation from the Sixth Amendment during the suppression hearing, and obtaining a ruling from the district court on the issue. *See State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015). Green also preserved error on his challenge to the jury instructions by objecting to them, identifying authority for his objection, and obtaining a ruling. *See State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015); *State v. Overmann*, 220 N.W.2d 914, 918 (Iowa 1974).

**IV. Analysis.**

**A. The Right to Counsel.** Article I, section 10 of the Iowa Constitution identifies the rights of "the accused" in "all criminal prosecutions, and in cases involving the life, or liberty of an individual." Iowa Const. art. I, § 10. The enumerated rights are

> to a speedy and public trial by an impartial jury; to be informed of the accusations against him, to have a copy of the same when demanded; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.

*Id.*

The right at issue in this case is the assistance of counsel in a criminal prosecution.[1] Green claims the right attached to the prearrest interview because enough prosecutorial forces of the state had been committed against him to make him "the accused" and to make the interview the functional equivalent of a "criminal prosecution[]." *Id.* The claim relies only on the article I, section 10 right to counsel, although it utilizes concepts of the right found within the privilege against self-incrimination.[2]

It is a "universal principle of constitutional law" that the provision of counsel for the defense of the accused is "essential to any fair trial."

---

[1]We discussed the origin of the "cases" portion of article I, section 10 in *State v. Senn*, 882 N.W.2d 1, 12–16 (Iowa 2016); *id.* at 41–47 (Wiggins, J., dissenting); *id.* at 65–68 (Appel, J., dissenting). We reaffirm the general proposition that this textual difference indicates a broader right to counsel under the Iowa Constitution than its federal counterpart, *see, e.g.*, *State v. Young*, 863 N.W.2d 249, 271, 281 (Iowa 2015) (concluding the "cases" language supports a right to counsel in certain misdemeanor prosecutions that is not provided by the U.S. Constitution), but find Green's argument is properly resolved by focusing on when a "criminal prosecution[]" begins. Iowa Const. art. I, § 10. The State's "case" against Green is a criminal one. There must be a prosecution before the Iowa Constitution will provide him a right to counsel.

[2]Green does not pursue alternative arguments under article I, sections 8 or 9 on appeal. We address his claim only under the right to counsel provided by article I, section 10.

*Powell v. Alabama*, 287 U.S. 45, 70, 53 S. Ct. 55, 64 (1932) (first quoting 1 Cooley's Constitutional Limitations 700 (8th ed.); and then quoting *Ex Parte Chin Loy You*, 223 F. 833, 838 (D. Mass. 1915)); *see also State v. Peterson*, 663 N.W.2d 417, 426 (Iowa 2003) (noting the constitutional guarantee of counsel "maintains the fair administration of our criminal justice system by assuring aid to the accused when confronted by the government adversary"). This is a basic and prominent goal, and we have broadly construed the right to achieve it. *See State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987) ("We broadly construe this provision to effectuate its purpose, which was to correct the imbalance between the position of the accused and the powerful forces of the State in a criminal investigation."). In short, the constitutional right to counsel provides "an aid to the understanding and protection of [other] constitutional rights," *Moran v. Burbine*, 475 U.S. 412, 468, 106 S. Ct. 1135, 1166 (1986) (Stevens, J., dissenting), and is "indispensable to the fair administration of our adversary system of criminal justice," *Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977). Our founders provided it because the system is balanced only when both the state and the accused have the professional assistance of counsel.

While the purpose of the right to counsel applies to both trial and pretrial proceedings, even beyond, the text of article I, section 10 applies to "criminal prosecutions" and to "the accused." We must decide if this text extends the right to counsel to an interview conducted just prior to the filing of a complaint and the issuance of an arrest warrant.

In applying the right to counsel under the Sixth Amendment to the U.S. Constitution, the Supreme Court has held that a criminal prosecution commences only after "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v. Gillespie*

*County*, 554 U.S. 191, 198, 128 S. Ct. 2578, 2583 (2008) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 2297 (1984)). Under this standard, Green had no right to counsel. The interview occurred before any of these formal events.

Like article I, section 10, the text of the right to counsel under the Sixth Amendment applies to "the accused" in all "criminal prosecutions." However, in applying the Sixth Amendment to our state criminal procedure, we have held that the criminal prosecution required by the text of the clause exists once a complaint has been filed and an arrest warrant has been issued. *See State v. Jackson*, 380 N.W.2d 420, 424 (Iowa 1986); *State v. Johnson*, 318 N.W.2d 417, 434–35 (Iowa 1982).

In *Johnson*, the defendant was arrested after the county attorney filed a complaint against him. 318 N.W.2d at 427. Police officers subsequently interrogated him in an interview room of the jail and obtained inculpatory statements. *Id.* at 427–28. We held the interview could not be characterized as investigatory in nature once the "forces of the state had solidified in a position adverse to defendant" by virtue of the filing of the criminal complaint and issuance of an arrest warrant. *Id.* at 435. Additionally, we observed the prosecuting attorney had become intimately involved in the case. *Id.* In *Jackson*, as in *Johnson*, a defendant was questioned in an interview room of the jail following an initial appearance on an arrest and a criminal complaint. 380 N.W.2d at 422. We held the right to counsel attached prior to the interview because the arrest warrant and complaint showed a commitment by the state to prosecute the defendant. *Id.* at 424. We rejected the state's claim that the interview was investigatory because the prosecuting attorney did not participate in the proceedings. *Id.* at 423. Instead, we found the totality of the prosecutorial forces had focused on the defendant and showed a commitment by the state to prosecute him. *Id.* at 424.

Accordingly, once a complaint has been filed and an arrest has occurred, a police interview is no longer a criminal investigation. Instead, it takes the shape of an accusation. This conclusion is even more evident when the interviewing involves significant participation by the prosecutor. As such, we have held that a criminal prosecution for the purposes of the right to counsel does not just begin with the filing of the trial information or other formal charges. *See Jackson*, 380 N.W.2d at 423; *Johnson*, 318 N.W.2d at 435. Instead, a criminal prosecution for the purposes of the right to counsel can also begin once the preliminary complaint and arrest occurs. *See Jackson*, 380 N.W.2d at 423; *Johnson*, 318 N.W.2d at 435. Furthermore, we recognize that the "cases" language of article I, section 10 reflects that the right to counsel can exist even without the filing of formal or informal charges. *See State v. Young*, 863 N.W.2d 249, 279 (Iowa 2015) ("What is apparent, therefore, is that one of the purposes of the 'cases' language was to guarantee the protections of article I, section 10 to those whom no formal criminal prosecution was or could be instituted, thereby providing broader protections than the United States Constitution."). In other words, the right is not entirely dependent upon the existence of criminal charges. Green argues the approach we have taken under our constitution supports interpreting a "criminal prosecution[]" under article I, section 10 to include the police interview in this case.

We are aware of no other state court in the nation that has held the right to counsel attaches during a criminal investigation prior to the filing of charges. This observation is not made to reject Green's claim or to deter us from our task to interpret our constitution, but to only recognize the limited backdrop we draw upon.

At the same time, we recognize that the purpose of the right to counsel under article I, section 10 is generally applicable to all police

interviews with suspects of crimes. It is common for police officers to be trained in the interrogation of suspects and in eliciting confessions. *See Miranda v. Arizona*, 384 U.S. 436, 449–55, 86 S. Ct. 1602, 1615–17 (1966). Importantly, confessions are normally powerful evidence of guilt. *See Escobedo v. Illinois*, 378 U.S. 478, 487–88, 84 S. Ct. 1758, 1763–64 (1964). Thus, the reason for counsel to represent a suspect during an interview is the same as the reason for counsel to represent a suspect during trial. *See id.* at 486, 84 S. Ct. at 1762.

Notwithstanding, the text of the constitution is at the core of our analysis and is our primary focus. *See State v. Briggs*, 666 N.W.2d 573, 578 (Iowa 2003) (noting while "[o]ur polestar in this analysis is the intent of the framers of our constitution[,]" "[f]irst and foremost, '[w]e give the words used by the framers their natural and commonly-understood meaning'" (fourth alteration in original) (quoting *Howard v. Schildberg Constr. Co.*, 528 N.W.2d 550, 553 (Iowa 1995))). The text tells us that the right to counsel applies only to the accused and, for the purposes of this case, only to a criminal prosecution. *See* Iowa Const. art. I, § 10. Thus, we can only recognize a right to counsel in this case if the evidence supports the conclusion that Green was the accused in a criminal prosecution at the time of the interview. In making this decision, we are not confined to our prior holdings in *Johnson* and *Jackson* that a criminal prosecution at least requires a complaint to be filed and an arrest warrant to be issued, but we are confined to the meaning of a criminal prosecution. Accordingly, the facts before us must justify the conclusion we reach. This is because we interpret our constitution consistent with the text given to us by our founders through the lens of the facts and circumstances of today. *See Griffin v. Pate*, 884 N.W.2d 182, 202 (Iowa 2016); *Varnum v. Brien*, 763 N.W.2d 862, 876 (Iowa 2009).

It is important to observe that the words used in both our constitution and the U.S. Constitution to articulate the "right to counsel" have remained the same over time. The text tells us the right applies only to "criminal prosecutions."[3] Yet, it was not until 1932 that the U.S. Supreme Court declared the concept of a "criminal prosecution" extended beyond the trial itself. *See Powell*, 287 U.S. at 58, 53 S. Ct. at 59–60. Over time, it was extended again to custodial interrogations prior to any charges once a general criminal investigation has focused on a specific suspect. *See Escobedo*, 378 U.S. at 490–91, 84 S. Ct. at 1765. Eventually, the view broadened to "at least," *Rothgery*, 554 U.S. at 212, 128 S. Ct. at 2591, all "critical stages" of criminal proceedings. *See United States v. Wade*, 388 U.S. 218, 227, 87 S. Ct. 1926, 1932 (1967). The facts and circumstances of each case were the tools for developing the constitutional meaning.

The facts and circumstances of this case confirm that Green was not formally or informally an "accused," and the interview was not a "criminal prosecution" under our existing jurisprudence. Green appeared voluntarily at the police station. He could have left the interview room or stopped the interview at any time. There was no warrant for his arrest, and there were no charges filed against him. These facts signal a police investigation, not a criminal prosecution.

In truth, many circumstances can be articulated to distinguish a prearrest interview from a criminal prosecution. Additionally, the right to counsel is not the sole protection against the fundamental and inherent imbalance in a police interview. The constitution addresses this imbalance initially by prohibiting police from seizing individuals without

---

[3]Again, we recognize the right also applies in "cases involving the life, or liberty of an individual." Iowa Const. art. I, § 10. However, as noted above, this case concerns a criminal prosecution.

reasonable suspicion of a crime or probable cause to believe a crime occurred. *See* Iowa Const. art. I, § 8; *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). Next, it requires the police give warnings before engaging in a custodial interview. *See* Iowa Const. art. I, § 9; *State v. Schlitter*, 881 N.W.2d 380, 395 (Iowa 2016). It is only once a prosecution is commenced that the imbalance is corrected through the adversary process and through the right to counsel given by article I, section 10.

In the end, Green relies in large measure on the involvement of the prosecuting attorney in the interview to elevate it into a criminal prosecution of an accused. But the facts that describe this involvement do not support a criminal prosecution either. *See State v. Evans*, 495 N.W.2d 760, 765 (Iowa 1993). The prosecutor only participated in the interview as an investigator, just as the police officers. He did not confront Green as an accused or direct accusatory statements toward him. Instead, the prosecutor had joined with law enforcement to investigate and gather evidence of a crime. The prosecutor assisted by seeking warrants and guiding the police throughout the investigation. The prosecutor then used this evidence to prosecute Green by filing a trial information.

It is important to remember that the democracy of our constitution is achieved in large part by the balance it creates between the forces of government and the rights of individuals. But the balance works with the use of many rights. The right to counsel is but one. Among all the rights, some attach before the criminal prosecution begins, some attach during the prosecution, and some attach after. The balance must also consider the role of criminal investigation and law enforcement in society. The adversarial process that gives rise to the right to counsel includes the accusatory stage, but excludes the investigatory stage. While the lines drawn between these stages can move over time, the facts

and circumstances of this case primarily identify the forces of an investigation, not a prosecution.

Assistance of counsel would aid a suspect during a police interrogation and would help correct the inherent imbalance between the investigatory forces of the government and a suspect, but our constitution does not give the right to counsel as a protection from all police encounters. It only applies to those accused by the government in a criminal prosecution or case involving life or liberty. We hold there is no right to counsel based solely on the presence and the assistance of a prosecuting attorney during an investigatory police interview.

**B. The Jury Instruction.** We have said, " 'Malice' . . . means that condition of mind which prompts one to do a wrongful act intentionally, without legal justification or excuse." *State v. McCollom*, 260 Iowa 977, 988, 151 N.W.2d 519, 525 (1967). When an individual acts on that state of mind, the individual is said to have acted with "malice aforethought." *See State v. Bentley*, 757 N.W.2d 257, 265 (Iowa 2008). In the homicide context, the wrongful act is taking a life, and therefore a person acts with malice aforethought if the person has a state of mind prompting the person to take the life of another intentionally, without legal justification or excuse. Malice aforethought may accompany an unlawful intent to kill, or may simply be an unlawful intent "to do physical harm to another" that results in death. *State v. Myers*, 653 N.W.2d 574, 579 (Iowa 2002); *see also State v. Ceretti*, 871 N.W.2d 88, 93–94 & n.4 (Iowa 2015); *Malice Aforethought, Black's Law Dictionary* (10th ed. 2014). Whether accompanied by a specific intent to kill or simply consisting of the general intent to do physical harm, "[a] person who kills another person with malice aforethought either express or implied commits murder," and not manslaughter. Iowa Code § 707.1.

Malice aforethought, then, is a term of art used to describe a culpable state of mind, an essential element of the offense of murder that the state must prove to the jury beyond a reasonable doubt. *See State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003). However, it is often impossible for a jury to determine a defendant's state of mind without the aid of inference. *See State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010). By instructing the jury that it may infer malice from the use of a dangerous weapon, courts present the jury with a straightforward example of how the State might prove the defendant's culpable state of mind. The inference, which the jury is permitted but never required to make, *see Sandstrom v. Montana*, 442 U.S. 510, 524, 99 S. Ct. 2450, 2459 (1979); *State v. Rinehart*, 283 N.W.2d 319, 323 (Iowa 1979), exists because a rational juror could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill. *See State v. Artzer*, 609 N.W.2d 526, 530 (Iowa 2000); *State v. Berlovich*, 220 Iowa 1288, 1294, 263 N.W. 853, 856 (1935); *see also State v. Ochoa*, 244 N.W.2d 773, 777 (Iowa 1976) ("It is presumed a person intends the natural consequences of his intentional acts."). If unjustified and unexcused, causing physical harm or death is a wrongful act, and therefore the intent to do these things is a state of mind that would constitute malice aforethought. *McCollom*, 260 Iowa at 988, 151 N.W.2d at 525. Thus, the jury may infer the defendant acted with malice aforethought by using a dangerous weapon, the natural consequence of which is physical harm or death.

We have approved instructions to this effect when defendants discharged a firearm aimed at a victim, *see Ambrose*, 861 N.W.2d at 560–61, struck a victim in the head with a blunt object, *see State v. Lass*, 228 N.W.2d 758, 761–62, 766 (Iowa 1975), and stabbed a victim in the chest with a penknife, *see State v. Roan*, 122 Iowa 136, 139, 97 N.W. 997, 998

(1904). Similarly, based on defendants' uses of a variety of dangerous weapons, we have relied on the inference to uphold convictions despite challenges to the sufficiency of evidence of the crime. *See, e.g.*, *Artzer*, 609 N.W.2d at 530 (firearm); *State v. Frazer*, 267 N.W.2d 34, 39 (Iowa 1978) (automobile); *State v. Emery*, 236 Iowa 60, 65, 17 N.W.2d 854, 856–57 (1945) (iron pipe); *State v. Heinz*, 223 Iowa 1241, 1259, 275 N.W. 10, 21 (1937) (hands and fists, when used against a small child). We approve of deadly weapon instructions because they are an accurate statement of the law and aid in defining the, although "time honored," often poorly understood concept of malice aforethought. 4 John L. Yeager & Ronald L. Carlson, *Iowa Practice*: *Criminal Law & Procedure* § 131, at 35 (1979).

However, there may be circumstances where it would not be appropriate to infer malice. For example, the defendant may argue the weapon was not deadly or dangerous. *See State v. Brown*, 67 Iowa 289, 291, 25 N.W. 248, 249 (1885); *see also State v. Greene*, 709 N.W.2d 535, 537–38 (Iowa 2006). The inference would be inappropriate because death or grievous bodily harm is not a foreseeable consequence of using the "weapon." Or, the defendant may concede the weapon was deadly, but assert it was not used intentionally, such as when a firearm is accidentally discharged. *See State v. Pepples*, 250 N.W.2d 390, 392, 395 (Iowa 1977); *State v. Smith*, 242 N.W.2d 320, 325–26 (Iowa 1976). If the trier of fact accepts the defendant's assertion, the inference would be inappropriate because the defendant did not intend the foreseeable consequences of the action. Finally, the defendant may argue the inference is improper because, even though the weapon was deadly, and even though the defendant intended the foreseeable consequences of using it, the defendant had adequate provocation or fear of imminent bodily harm to use the weapon. *See Reeves*, 670 N.W.2d at 207; *State v.*

*McNamara*, 252 Iowa 19, 25–26, 104 N.W.2d 568, 572 (1960); *State v. Borwick*, 193 Iowa 639, 643, 187 N.W. 460, 462 (1922). The inference would be inappropriate because the defendant's state of mind was not malicious, but instead was justified or excused. Green asserts the inference was inappropriate in his case based on the last of these examples; he argues the evidence did not show he committed the homicide with malice because he did not bring the weapon to the encounter and he was acting in self-defense. *See* 4 Robert R. Rigg, *Iowa Practice Series™: Criminal Law* § 3:5, at 94 (2016–2017). Essentially, Green challenges the jury instruction in this case by asserting there was not substantial evidence to support it. *See Hanes*, 790 N.W.2d at 548.

Green testified he held a baseball bat to Koster's throat until he died. Medical expert testimony was introduced at trial that, under these circumstances, this would have taken up to two minutes. The foreseeable consequence of a person with a significant weight advantage forcing a bat against the throat of another person for that length of time is death. Green concedes he did this, and death followed. Thus, while Green did not bring the weapon to the encounter, a rational observer could infer he intended to kill Koster when he used the bat in that manner. It could also infer he did so with malice aforethought.

While evidence that a person took a dangerous weapon to a fight could support an inference of malice aforethought, it is not a requirement. Malice aforethought is inferred simply from the use of the dangerous weapon, *see State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001), and the manner that Green used the bat in this case—to cause death to another—supports the inference of malice aforethought. The instructions on malice aforethought and a dangerous weapon accurately stated the law, and there was substantial evidence presented at trial to support them. We do not find them redundant. *See Ambrose*, 861

N.W.2d at 561. Therefore, if the jury rejected Green's self-defense argument, it could, but was not required to, infer Green acted with malice aforethought from his use of a dangerous weapon. Later instructions explained Green's justification defense and the State's burden to overcome it. Moreover, the jury was instructed it could only find Green guilty of second-degree murder if it found the State proved he lacked justification. Green does not object to these other instructions, and the jury apparently found the State met its burden of proof. We find no error.

We hold the court properly instructed the jury that it could infer Green acted with malice aforethought from his use of a dangerous weapon. Thus, we necessarily hold there was no constitutional error. Because we conclude there was no constitutional error in the jury instructions, we do not address the State's assertion that Green failed to preserve a constitutional argument, nor do we address Green's alternative claim of ineffective assistance of counsel. Finally, we do not decide whether a malice-inference jury instruction is always appropriate when a person kills another with a dangerous weapon. We hold only that in Green's case, such an inference was permissible.

**V. Conclusion.**

We reject Green's claims of error and affirm the judgment of the court of appeals. There was no right to counsel provided by article I, section 10 of the Iowa Constitution at the time of Green's voluntary and noncustodial interview with police under the supervision of an Iowa county attorney. The constitutional right to counsel is essential to ensuring a fair trial, but has no application without a prosecution or case with which counsel could aid the accused. There was no prosecution or case at the time of Green's interview. As to the use of a jury instruction on inferring malice aforethought from the use of a dangerous weapon,

this was an accurate statement of the law and supported by the evidence in this case. Malice aforethought is a legal term of art used to describe a culpable mental state. Mental states necessarily must be proven by inference. It was not error to provide the jury with this guidance, as Green's actions supported an inference of malice. For these reasons, we affirm.

**AFFIRMED.**

Wiggins, Hecht, Mansfield, and Zager, JJ., join this opinion. Appel, J., files a concurring opinion joined by Wiggins and Hecht, JJ. Waterman files a separate concurring opinion joined by Zager, J.

**APPEL, Justice (concurring specially).**

This fact-bound case has been decided narrowly on the record presented. At the time of John Green's interview, no indictment had been handed down, no criminal complaint or trial information had been filed, no warrant for his arrest had been sought or issued, and Green had not been arrested. Green had not retained counsel prior to the interview and did not request an opportunity to speak with counsel during the interview.

Further, although the prosecutor traveled to Florida, viewed the interrogation from another room, and appears to have on a couple of occasions discussed the progress of the interrogation with police officers, Green has failed to show he faced an imbalance by being confronted with a trained prosecutor skilled in the arts of interrogation. Instead, the record shows only the officers occasionally talked with the prosecutor during breaks of the interview, the prosecutor suggested areas of inquiry or direction of the interview, and little else. Nothing in the record shows the prosecutor's involvement had shifted from an investigative to an accusatorial role.

As a result, Green's right to counsel argument fails. Article I, section 10 of the Iowa Constitution does not prohibit law enforcement from seeking advice from county attorneys in the course of a criminal investigation. The record is thus not sufficient to trigger the right to counsel even under a broad construction of the "all criminal prosecutions" clause or the distinctive "cases" language of article I, section 10. *See State v. Senn*, 882 N.W.2d 1, 36–47 (2016) (Wiggins, J., dissenting) (describing the unique features and history of article I, section 10). *See generally id.* at 50–68 (Appel, J., dissenting).

Wiggins and Hecht, JJ., join this special concurrence.

**WATERMAN**, **Justice (concurring specially).**

I respectfully concur in the result of the majority's opinion. I write separately to reiterate that no right to counsel attaches under article I, section 10 of the Iowa Constitution before the filing of criminal charges in a court proceeding, for the reasons thoroughly explained in *State v. Senn*, 882 N.W.2d 1, 8–31 (Iowa 2016) (surveying language and history of article I, section 10 and determining no right to counsel existed during implied-consent procedures before charges filed). As the majority correctly observes, there is "no other state court in the nation that has held the right to counsel attaches during a criminal investigation prior to the filing of charges."

Green claims he had a precharge right to counsel under article I, section 10 because an Iowa prosecutor and police traveled to Florida in tandem and the prosecutor guided the police interview. The Fifth Amendment and article I, section 9 of the Iowa Constitution require *Miranda* warnings to protect the right to counsel during *custodial* interviews before and after the filing of criminal charges. *See State v. Schlitter*, 881 N.W.2d 380, 395 (Iowa 2016) (noting under both the Iowa and Federal Constitutions, "[l]aw enforcement officers are required to give *Miranda* warnings when a suspect is in custody and subjected to interrogation" and analyzing whether defendant was in custody). But as the majority holds, Green's right to counsel was not triggered in his *noncustodial* interview conducted as part of the police investigation before the State of Iowa charged him with a crime.

I do not join the majority opinion to the extent it relies on *State v. Young*, 863 N.W.2d 249, 279 (Iowa 2015), and inaccurately suggests *in dicta* that "the 'cases' language of article I, section 10 reflects that the

right to counsel can exist even without the filing of formal or informal charges." *Young* does not stand for that proposition. To the contrary, *Young* found a right to counsel in cases in which criminal *misdemeanor* charges that carried a potential sentence of incarceration had been filed. *Id.* at 281.

Our court has never previously held or suggested the right to counsel under section 10 could arise before a criminal case is commenced in court. Why suggest that now? We should decide the case before us and leave it at that.

Zager, J., joins this special concurrence.